**This order is SIGNED.**

**Dated: December 6, 2024**



JOEL T. MARKER
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re: <br><br> HEIDI WILLIAMS, <br><br> Debtor. | Bankruptcy Case No. 23-23245 <br><br> Chapter 7 |
| IAN J. COOPERSTEIN, <br><br> Plaintiff, <br><br> v. <br><br> HEIDI WILLIAMS, <br><br> Defendant. | Adversary Proceeding No. 23-2102 <br><br> Judge Joel T. Marker |

**MEMORANDUM DECISION**

As an area of federal law, bankruptcy is both unusual and highly consequential. By permitting qualified debtors to discharge their financial obligations, it upends normal contract expectations, which has obvious downstream effects on the counterparties who remain unpaid. As such, bankruptcy can be difficult enough when the parties have only an arm's-length commercial relationship, let alone when they have a deeper personal history that brings emotions into play. Here, after several years of knowing each other, Plaintiff Ian J. Cooperstein made certain loans to Defendant Heidi Williams and eventually allowed her to rent part of his home,

1

but she failed to timely and fully repay all of those outstanding debts and allegedly failed to clean and repair the property after moving out while also taking some of his personal items. The Court conducted a trial on October 24, 2024 regarding Mr. Cooperstein's claims for nondischargeability under § 523(a)(2)(A), (a)(2)(B), and (a)(6) of the Bankruptcy Code and took the matter under advisement.[1] After considering the evidence properly before the Court, assessing the credibility of the witnesses, considering the parties' arguments, and conducting an independent review of applicable law, the Court issues the following Memorandum Decision to explain why Ms. Williams' debts to Mr. Cooperstein will be discharged.[2]

## I. BACKGROUND / FACTS

The process of getting to trial in this adversary proceeding was somewhat arduous, in part because both parties initially represented themselves,[3] and the Court incorporates the records from all six prior hearings and conferences into this Memorandum Decision as background. Ultimately, Mr. Cooperstein's claims were narrowed to those presented at trial, which was conducted as an expedited or "fast-track" trial under Local Rule 7016-1(d) without objection from either party.[4] And as with other aspects of this adversary proceeding, the trial record has its own occasional difficulties, inconsistencies, and lack of clarity.

The parties met on Tinder in the summer of 2018, and while the exact nature of their subsequent relationship is unclear—and contact may have been severed for most of 2020—it

---

[1] All statutory references are to title 11 of the United States Code unless otherwise indicated.
[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Any of the findings of fact herein are also deemed to be conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.
[3] Mr. Cooperstein represented himself throughout the proceeding, while Ms. Williams ultimately obtained the assistance of pro bono counsel.
[4] Local Rule 7016-1(d) provides that "[a]t the initial pretrial conference, if the amount of the controversy is $15,000 or less, or by consent of the parties, the court may order that the trial be scheduled on an expedited basis. The scheduling order will govern the procedure to be followed before and during an expedited trial." *See* docket #s 42 and 49.

2

appears to have ranged from a close friendship to a romantic partnership.[5] On February 19, 2021, Mr. Cooperstein loaned Ms. Williams $2,200 to hire a family law attorney, which Mr. Cooperstein expected to be repaid by March 6 from Ms. Williams' 2020 tax refunds.[6] Like all of the transactions at issue in this proceeding, there was no formal written agreement to document this loan or its terms. Mr. Cooperstein testified that he knew Ms. Williams was anticipating certain 2020 tax refunds but was unaware of the amount when he offered the loan.[7] He also testified that Ms. Williams failed to repay any of the loan by March 6.[8] There is ample confusion in the record as to how much, if anything, Ms. Williams paid on this debt and subsequent obligations between the first loan date of February 19, 2021 and her chapter 7 petition date of August 2, 2023, but Mr. Cooperstein was adamant that he received no payments of any kind from Ms. Williams until October 2021.[9]

Despite Ms. Williams' default on the first loan (in Mr. Cooperstein's own telling), Mr. Cooperstein nevertheless loaned her an additional $3,920 around June 2021—ostensibly $1,200 for a security deposit and $2,720 for first and last month's rent at a property on Highland View Circle.[10] Then, still having received no payments on the three loans totaling $6,120, Mr.

---

[5] *See, e.g.*, October 24 Hearing Recording at 10:08:32-10:08:43 AM: "I would say that Heidi Williams is someone that I considered to be one of my best friends for a period of approximately four years." (Cooperstein opening statement); *id.* at 12:50:26-12:50:30 PM: "She was one of my best friends. I wanted to help her." (Cooperstein testimony); *id.* at 12:14:30-12:14:40 PM: "You were my boyfriend. We were in a romantic relationship. We were intimate. You met my family, my extended family, both sides." (Williams testimony).
[6] *See, e.g.*, Plaintiff's Exhibit 8a and Defendant's Exhibit A. At trial, Ms. Williams suggested that Mr. Cooperstein made the offer without her asking, while Mr. Cooperstein countered that he only made the offer in lieu of Ms. Williams' initial request for him to co-sign for a loan, but the precise impetus for the offer is not material here.
[7] October 24 Hearing Recording at 12:44:05-12:44:35 PM.
[8] *Id.* at 10:29:46-10:29:52 AM.
[9] For example, there was conflicting testimony and documentary evidence about whether certain Amazon purchases made around March 17, 2021 were gifts for Ms. Williams or credits against the first loan debt; whether Ms. Williams paid $985 in cash to Mr. Cooperstein around March 17, 2021; and whether Ms. Williams paid $0, $1,200, or $1,800 toward the first loan debt in April 2021. For his part, Mr. Cooperstein asserts that the only payments he could identify were an $840 payment from a returned security deposit in mid-October 2021 and some partial rent payments that started on January 15, 2022. *See, e.g.*, Plaintiff's Exhibit 62.
[10] Mr. Cooperstein asserted that "shortly" after the first loan default, Ms. Williams asked him to accept repayment on the first loan "over the next several months" and stated that he would be repaid "no later than" the following year (around March 2022) from her 2021 tax refunds. October 24 Hearing Recording at 10:29:56-10:30:38 AM. He also

Cooperstein allowed Ms. Williams to rent the upstairs portion of his home starting October 1, 2021 under an alleged oral lease for $700/month (later apparently $800/month), including utilities, with his "expectation" of payment on the first of the month.[11] Mr. Cooperstein asserted that he agreed to this arrangement—which required him to ask his existing tenant to vacate the premises early—in part because the cheaper rent and proximity to each other would increase the odds of Ms. Williams repaying her loan obligations, and in part because Ms. Williams claimed that she and her children would otherwise be homeless.[12] But Ms. Williams paid no rent until January 15, 2022, after which Mr. Cooperstein's own records show that she ultimately paid most of the amounts due between January 15 and July 31, 2022, albeit not on the first of each month.[13]

On July 14, 2022, Mr. Cooperstein asked Ms. Williams "to leave the property and not come back,"[14] and she left that very same day, which triggered around 30 more days of confusing and contentious interactions involving Ms. Williams' alleged obligations to clean and repair the property and her retrieval of certain items from the property that ultimately came to involve law enforcement.[15] Mr. Cooperstein sued Ms. Williams in two separate small claims actions in the fall of 2022, one for the three loans and one for unpaid rent, property damage, and stolen items. The first action on the loans resulted in an October 19, 2022 settlement agreement for $5,440 that required Ms. Williams to pay a minimum of $150/month for 25 months starting

---

asserted his "expect[ation]" to receive repayment of "about half" of the June 2021 loans in September 2021 and Ms. Williams' purported promise at some point to repay all three loans with her 2021 tax refunds. *Id.* at 10:42:21-10:42:30 AM and 10:54:53-10:55:25 AM. But on cross-examination, the only testimony that Mr. Cooperstein elicited from Ms. Williams involved her alleged promise to repay the first loan from her 2021 tax refunds, to which she said: "I think that was my intention." *Id.* at 12:24:33-12:24:58 PM.

[11] The $840 payment that he eventually received in mid-October 2021 was from a partial return of the $1,200 security deposit on the Highland View Circle property.

[12] *See, e.g.*, October 24 Hearing Recording at 10:55:39-10:56:03 AM, 12:46:45-12:46:52 PM, and 12:50:43-12:51:02 PM.

[13] Plaintiff's Exhibit 62.

[14] October 24 Hearing Recording at 12:49:05-12:49:15 PM.

[15] *See, e.g.*, October 24 Hearing Recording at 11:01:26-11:16:24 AM, 12:06:07-12:13:41 PM, and 12:51:25-12:56:58 PM.

in December 2022, with the full balance due by December 1, 2024.[16]  And after a procedural hiccup involving dismissal without prejudice for lack of timely service, the second action on the property resulted in a default judgment for $4,210 at 6.73% interest that was entered on May 10, 2023.[17]  Mr. Cooperstein admits that Ms. Williams made the minimum payments under the settlement agreement for at least six months but faults her for not making a balloon payment from her 2022 tax refunds in the spring of 2023.  Mr. Cooperstein also admits that he was only eight days away from a writ of execution hearing on the default judgment when Ms. Williams filed for bankruptcy, which she testified was the precipitating factor in her decision to do so.[18]

## II. DISCUSSION

A.    § 523(a)(2)(A)

Mr. Cooperstein's first claim for relief is based on § 523(a)(2)(A), which excepts from discharge any debt "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  "In order to establish a non-dischargeable claim under § 523(a)(2)(A) [based on false representation], a creditor must prove the following elements by a preponderance of the evidence: [1] the debtor made a false representation; [2] the debtor made the representation with the intent to deceive the creditor; [3] the creditor relied on the representation; [4] the creditor's reliance was justifiable; and [5] the debtor's representation proximately caused the creditor to sustain a loss."[19]

---

[16] Plaintiff's Exhibits 21 and 25.
[17] Plaintiff's Exhibit 19.  Mr. Cooperstein intimated that Ms. Williams evaded service of the original summons and complaint, while Ms. Williams testified that she was unaware of the second action until after entry of the default judgment.  October 24 Hearing Recording at 12:36:09-12:37:25 PM.  In his closing argument, Mr. Cooperstein also asserted that "about a thousand dollars" of the default judgment was for "property that was stolen and damages to the home," which constitutes "much of [the] damages" supporting his § 523(a)(6) claim. *Id.* at 1:07:00-1:07:32 PM.
[18] October 24 Hearing Recording at 11:16:49-11:25:13 AM and 12:37:41-12:38:07 PM.
[19] *Ward v. Pewtress (In re Pewtress)*, Adv. No. 09-2491, 2010 WL 5108732, at *3 (Bankr. D. Utah Dec. 9, 2010) (*quoting In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009)) (quotations and citations omitted).

"As to the second element of the § 523(a)(2)(A) test, intent to deceive need not be shown by direct evidence but may be inferred from the totality of the circumstances and includes reckless disregard of the truth. That said, the mere inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent. As to the third and fourth elements, the justifiable reliance standard is not reasonableness in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was justifiable from a subjective standpoint. In determining whether a creditor's reliance was justifiable, a court should therefore examine the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases. Even under the justifiable test, however, the plaintiff must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it. Moreover, this test does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt about reliance in fact. In effect, reasonableness goes to the probability of actual reliance."[20]

"And although § 523(a)(2)(A) generally requires false representations as to past or current facts rather than promises related to future actions, a debtor's misrepresentation of [her] intentions may constitute a false representation within the meaning of § 523(a)(2)(A) if when the representation was made the debtor had no intention of performing as promised. To qualify as an affirmation of fact, a statement must be objective in nature, *i.e.*, verifiable or capable of being proven true or false. Similarly, to be relied upon as a promise, a statement must be highly specific or definite."[21]  Mere boasting or puffery does not suffice.[22]

---

[20] *Pewtress*, 2010 WL 5108732, at *4 (quotations and citations omitted).
[21] *Id.* (quotations and citations omitted).

6

The Court finds that Mr. Cooperstein has not met his burden to demonstrate a false representation claim under § 523(a)(2)(A).  As to the first loan for $2,200 on February 19, 2021, Mr. Cooperstein did not establish actual reliance on Ms. Williams' representation about her anticipated 2020 tax refunds of $4,444 since he admitted that he was unaware of the refund amount when he made the loan offer to Ms. Williams.[23]  And to the extent that Ms. Williams made a binding promise to repay the first loan with her 2020 tax refunds by March 6, Mr. Cooperstein did not establish that the representation was false when it was made or that she had the requisite intent to deceive.  Defendant's Exhibit C indicates that Ms. Williams received her state tax refund of $538 on March 4 but did not receive her federal refund of $3,716.23 until March 17—for a total of $4,254.23—and the balance of Exhibit C shows other intervening expenses that Mr. Cooperstein did not meaningfully address at trial.[24]

The subsequent loans for $1,200 and $2,720 around June 2021 are even more problematic.  Not only had Ms. Williams already defaulted on the first loan by the time these loans were made, according to Mr. Cooperstein himself, but there is no written evidence in the trial record regarding the terms of these transactions.  Mr. Cooperstein testified that shortly after defaulting on the first loan, Ms. Williams had asked to repay him "over the next several months" but "no later than" the spring of 2022 when she received her 2021 tax refunds.  He also testified that at some point, all three loans became subject to this same promise.  But the only testimony he elicited from Ms. Williams at trial was a single sentence regarding her purported promise to

---

[22] *See, e.g., Phoenix Equity Ventures, LLC v. Baillio (In re Baillio)*, Adv. No. 08-1124 S, 2010 WL 3782065, at *12 n.23 (Bankr. D.N.M. Sept. 21, 2010); *Boud v. SDNCO, Inc.*, 54 P.3d 1131, 1135 (Utah 2002) (describing puffery).
[23] Immediately after the screenshot of Ms. Williams' anticipated refund in Plaintiff's Exhibit 8a and Defendant's Exhibit A, Mr. Cooperstein also references further discussions about the matter: "I'm confused but it's def something we should talk about in person."  No evidence of such further communications was introduced at trial.
[24] There was muddled evidence about certain Amazon purchases and possible cash payments in March and April 2021, but the Court will accept Mr. Cooperstein's own payment history record for purposes of this opinion.  *See* FN 9 *supra* and Plaintiff's Exhibit 62.

repay the first loan with her 2021 tax refunds: "I think that was my intention."[25] And no evidence was presented as to the disposition of Ms. Williams' 2021 tax refunds, if any. So even assuming that a promise to repay one or more of the loans with 2021 tax refunds was made, Mr. Cooperstein has not established the falsity of that representation, the requisite intent to deceive, or actual reliance on the speculative existence and amount of the future tax refunds—not to mention the justifiability of any reliance given Ms. Williams' default on the first loan.

And yet, despite three unpaid loans totaling $6,120, Mr. Cooperstein allowed Ms. Williams to rent the upstairs portion of his home starting on October 1, 2021 for $700/month (apparently later $800/month).[26] Although Mr. Cooperstein stated his "expectation" that rent would be due on the first of each month, there is no evidence in the record that Ms. Williams shared his expectation. There is also no evidence in the record regarding any requirements for Ms. Williams to clean or repair the property upon move-out. And although Ms. Williams paid no rent in October, November, or December 2021, she did begin paying rent on January 15, 2022 and remained mostly current thereafter, as of the end of each month, through July 31, 2022. As such, the rent claim fails for similar reasons to the loan claims. Whatever the nature of the parties' relationship at the time, Ms. Williams admits that she agreed to pay rent but failed to do so between October 1, 2021 and January 15, 2022; however, Mr. Cooperstein has not established anything beyond the breach of an oral contract. He has not shown that Ms. Williams' promise to pay rent was false when it was made, that she had the requisite intent to deceive, that he actually relied on her promise, or that any reliance was justifiable given the outstanding unpaid loans and the lack of any indication about the source of her expected rent payments.

---

[25] *See* FN 10 *supra*.

[26] Mr. Cooperstein also testified that he "expected" to get back "about half" of the June 2021 loans in September 2021, which if true, also did not occur by the time he started renting his property to Ms. Williams. *See* FNs 10 and 11 *supra*.

Ms. Williams left Mr. Cooperstein's home on July 14, 2022, and Mr. Cooperstein sued her in small claims court for the balance of the unpaid loans soon thereafter. The parties promptly reached a settlement agreement on October 19, 2022 for a consolidated debt of $5,440 with minimum payments of $150/month for 25 months starting on December 15, 2022, with the full balance due by December 1, 2024.[27] Ms. Williams made the required minimum payments for at least six months (*i.e.*, through May 2023), but Mr. Cooperstein faults her for failing to use her 2022 tax refunds toward the obligation even though that is not required by the settlement agreement—or, for that matter, by the discussion that led up to the settlement agreement.[28] Meanwhile, Mr. Cooperstein was pursuing a separate small claims suit for unpaid rent, property damage, and stolen items that resulted in a default judgment being entered against Ms. Williams on May 10, 2023 while she was making payments under the settlement agreement as to the loans. And regardless of why it took Mr. Cooperstein until May 2023 to obtain a default judgment in the second action, Ms. Williams credibly testified that the judgment—of which she was allegedly unaware until after it was issued—was the ultimate reason that she filed for bankruptcy. These events also do not support Mr. Cooperstein's claim for nondischargeability under § 523(a)(2)(A).

Finally, although Mr. Cooperstein generally framed his arguments under the rubric of false representations, the result is the same if the Court were to review the elements of false pretenses or actual fraud. "False pretenses under [§] 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. False pretenses can be defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend

---

[27] Plaintiff's Exhibit 25.
[28] Plaintiff's Exhibit 21.

money or property to the debtor."[29] In turn, "[a]ctual fraud occurs when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[30] Although "difficult to define precisely," it "connotes deception or trickery that is done with wrongful intent, and the fraud must be actual in contrast to implied fraud or fraud in law."[31] The Court would reject these alternate theories for the reasons already discussed. Just as the evidence fails to support the elements of false representation, the evidence also fails to show material omissions or a course of conduct by Ms. Williams that wrongfully induced Mr. Cooperstein to make the loans or rent his property. And a claim for inducement-based actual fraud still requires proof of reliance,[32] but even if it only required some intentional design to deprive or cheat, no such scheme exists by a preponderance of the evidence on this record.[33]

B.   § 523(a)(2)(B)

Mr. Cooperstein's remaining claims can be disposed in relatively short order. Section 523(a)(2)(B) excepts from discharge any debt "to the extent obtained by use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." In turn, the Supreme Court held in *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) that a statement about a single asset can be a "statement respecting the debtor's financial condition" for purposes

---

[29] *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013) (quotations and citations omitted).
[30] *Id.* (quotations and citations omitted); *see also Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 10-11 (10th Cir. BAP 2016).
[31] *Grange Ins. Ass'n v. Woods (In re Woods)*, 660 B.R. 905, 917 (10th Cir. BAP 2024) (quoting *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016)).
[32] *Woods*, 660 B.R. at 916-18.
[33] Nor is there sufficient evidence of any fraud that was not inducement-based, such as the fraudulent conveyance scheme at issue in *Husky*. Mr. Cooperstein testified that he only learned in July 2022 that Ms. Williams had the ability to stay with family and/or borrow money, and he said in his closing argument that Ms. Williams "squandered" various tax refunds and that it was possible for Ms. Williams to have made more of an effort to satisfy her financial obligations to him, but none of these statements was developed at trial. *See* October 24 Hearing Recording at 12:51:03-12:51:17 PM and 1:09:13-1:09:41 PM.

of § 523(a)(2)(B). Here, the only potentially relevant written statement is the screenshot and related text messages from Ms. Williams regarding her anticipated 2020 tax refunds of $4,444.[34] But having already failed to meet his burden to demonstrate falsity, intent to deceive, and actual reliance by a preponderance of the evidence in connection with his § 523(a)(2)(A) claim, Mr. Cooperstein must necessarily fail to meet his burden under § 523(a)(2)(B) by a preponderance of the evidence as well.

C.  §523(a)(6)

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." "For an injury to be willful, there must be a deliberate or intentional injury [determined by a subjective standard], not merely a deliberate or intentional act that leads to injury. . . . Malicious intent is established by evidence that the debtor had knowledge of another's rights and, notwithstanding such knowledge, proceeded to take action in violation of those rights. In determining if an injury was malicious, evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite malice in addition to willfulness is present. . . . In short, to be malicious, the debtor's actions must be wrongful."[35]

Here, Mr. Cooperstein conceded during his closing argument that the "only evidence in the record" regarding his § 523(a)(6) claim is the May 10, 2023 default judgment,[36] which allegedly includes "about a thousand dollars" for "property that was stolen and damages to the home."[37] An unopposed default judgment establishes the existence and amount of a debt, but it says nothing about the nondischargeability of that debt, nor was there any evidence to support

---

[34] Plaintiff's Exhibit 8a and Defendant's Exhibit A.
[35] *Perry v. Judge (In re Judge)*, 630 B.R. 338, 344-45 (10th Cir. BAP 2021).
[36] October 24 Hearing Recording at 1:06:12-1:07:32 PM and Plaintiff's Exhibit 19.
[37] *See* FN 17 *supra*.

11

Mr. Cooperstein's assertion about the constituent parts of the judgment. Earlier in the trial on cross-examination, Mr. Cooperstein also curiously testified that "my claim is that she maliciously left the place in shambles. I'm not saying the original damage was done maliciously. I'm saying her unwillingness to rectify it is malicious."[38] But there is no evidence of any cleanup or repair terms in the oral lease, and it is unclear how the failure to rectify non-malicious damage is itself a malicious injury for purposes of nondischargeability, not to mention the confusing and contentious nature of the parties' interactions during the approximately 30 days after Ms. Williams left the premises. And again, there is no evidence in the record of any theft or intentional damage at all, both of which Ms. Williams denied in her direct testimony.[39] Accordingly, Mr. Cooperstein has failed to meet his burden under § 523(a)(6) by a preponderance of the evidence.

**D.     § 523(d)**

Finally, Ms. Williams requests a $5,000 fee award under § 523(d), which provides that "[i]f a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust." The Court agrees in the main that "[t]he purpose of § 523(d) is to deter creditors from bringing frivolous challenges to the discharge of consumer debts" and that having pro bono counsel does not itself qualify as a "special circumstance,"[40] but the Court nevertheless declines to award fees in this action. For

---

[38] October 24 Hearing Recording at 12:52:08-12:52:38 PM.
[39] *Id.* at 12:06:07-12:07:50 PM.
[40] *First Card v. Hunt (In re Hunt)*, 238 F.3d 1098, 1104 (9th Cir. 2001); *see also Brattleboro Hous. Auth. v. Stoltz (In re Stoltz)*, 392 B.R. 87 (Bankr. D. Vt. 2001).

starters, § 523(d) only covers actions under § 523(a)(2), but Mr. Cooperstein also pursued a claim under § 523(a)(6). The § 523(a)(2)(B) claim was essentially subsumed by the § 523(a)(2)(A) claim, both of which had non-frivolous support in the overall record with a reasonable basis in law and fact. And while the pro bono status of defense counsel may not count as a special circumstance, courts have recognized that the pro se status of a legally unsophisticated individual creditor might—particularly, as here, where Mr. Cooperstein has asserted his own financial difficulties resulting from the unpaid debts at issue.[41]

### III. CONCLUSION

The Court does not doubt the sincerity of Mr. Cooperstein's desire to help Ms. Williams and her children during the relevant period, the financial strain that the unpaid obligations caused him, or the time and effort that he put into pursuing his claims both in the Utah state courts and this Court. But the question here is whether Mr. Cooperstein has met his burden of proof by a preponderance of the evidence to demonstrate conduct by Ms. Williams that would warrant excluding his particular debts from the operation of her general chapter 7 bankruptcy discharge, and for the reasons discussed above, he has failed to do so on this trial record. Therefore, this adversary proceeding will be DISMISSED WITH PREJUDICE, and a separate judgment will be issued in accordance with this Memorandum Decision.

---------------------------------------------END OF DOCUMENT--------------------------------------------

---

[41] *See, e.g.*, *Tomey v. Dizinno (In re Dizinno)*, 559 B.R. 400, 409-13 (Bankr. M.D. Pa. 2016) (collecting cases and analyzing relevance of creditor's pro se status under substantial justification and special circumstance elements of § 523(d)).

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Ian J. Cooperstein
2714 S. McClelland St.
Salt Lake City, UT 84106
    *Plaintiff*

Heidi Williams
169 E 1st Ave, Apt. 48
Salt Lake City, UT 84103
    *Defendant*

Jeffrey L. Trousdale
Andrew W. Houlin
Cohne Kinghorn, P.C.
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
    *Counsel for Defendant*